154 F.3d 941
 98 Cal. Daily Op. Serv. 6645, 98 Daily Journal
D.A.R. 9255
David MEANS, Plaintiff-Appellant-Cross-Appellee,
v.
NORTHERN CHEYENNE TRIBAL COURT, Glenn Littlebird, Presiding
Judge for the Northern Cheyenne Tribal Court,
Defendants-Appellees-Cross-Appellants.
 Nos. 97-35952, 97-36013.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted April 6, 1998.
Decided Aug. 27, 1998.
 
 1
 Clarence Belue, Billings, Montana, for plaintiff-appellant-cross-appellee.
 
 
 2
 Steven A. Kelly, Lame Deer, Montana, for defendants-appellees-cross-appellants.
 
 
 3
 Appeals from the United States District Court for the District of Montana; Jack D. Shanstrom, District Judge, Presiding. D.C. No. CV-97-075-JDS.
 
 
 4
 Before: HUG, Chief Judge, REINHARDT, Circuit Judge, and REED, District Judge.*
 
 
 5
 Opinion by Judge REED; Concurrence by Judge REINHARDT.
 
 REED, District Judge:
 
 6
 Appellant David Means, a member of the Sisseton-Wapatan (Sioux) Tribe of Indians, is currently free on bail pending criminal prosecution in the Tribal Court of the Northern Cheyenne Indian Tribe. After being arrested and freed on bail, but prior to trial, Means sought habeas relief from the district court on jurisdictional grounds. He argued that the Tribal Court does not have criminal jurisdiction over him, as a nonmember Indian, for the crimes with which he is charged. The district court reviewed his petition, but denied relief. The court's holding was based on a federal statute enacted after all of the acts with which Means is charged were allegedly committed, and which purportedly "recognizes and affirm[s]" the criminal jurisdiction of all tribal courts over all Indians, whether or not members of the same tribe.
 
 
 7
 Further criminal proceedings in the Tribal Court have been stayed by this court pending disposition of these appeals. Means appeals the district court's denial of his petition, while the Tribal Court and its Presiding Judge, Glenn Littlebird (collectively, "the Tribal Court" or Appellees), cross-appeal the issue of whether the district court properly entertained Means' pre-trial habeas petition, or whether "principles of federalism and comity" require that defendants actually be convicted in tribal court before the federal courts intervene.
 
 I. FACTS AND PROCEDURAL HISTORY
 
 8
 On January 10, 1997, a complaint was filed in the Northern Cheyenne Tribal Court charging David Means with fifteen counts of aggravated sexual assault, under Section 7-4-7E of the Northern Cheyenne Tribal Code. Each count carries a maximum possible penalty of one year in jail and a $5000.00 fine.[1] All counts are alleged to have occurred between 1978 and 1988, and the alleged victims are two of Means' nieces. The comparatively recent filing of the criminal complaint in this case appears to stem from the fact that the victims have only recently "recovered" memories of the abuse, which is alleged to have happened when they were children.
 
 
 9
 At all times relevant to this case (that is, from prior to 1978 through the present), Means has lived within the Northern Cheyenne Indian Reservation in Montana. However, he is not a member of the Northern Cheyenne Tribe. He is an "Indian," though, since he is a member of the Sisseton-Wapatan (Sioux) Tribe.[2] Thus Means is a "non-member Indian" from the Northern Cheyenne Tribal Court's point of view. As will be discussed in detail below, jurisdiction over crimes committed in "Indian country"[3] is divided among tribal, state, and federal courts, depending on the status of the perpetrator and the victim as either non-Indians or Indians-and potentially, at least, as either non-member Indians or tribal members. Thus Means' status as a non-member Indian is crucial, but again, does not appear disputed.
 
 
 10
 Means was arrested on the same day that the complaint against him was filed. Bail was set initially at $50,000 cash; reduced to $30,000 cash by the court upon Means' motion; further reduced to $5000 on appeal; increased back to $30,000 on "full appeal"; and eventually reduced again to $10,000 by stipulation of the parties. Means has been free on bail since January 31, 1997, but he is apparently prohibited from leaving the reservation or the State of Montana, and from contacting children.
 
 
 11
 Means moved to dismiss the action for lack of jurisdiction on April 9, 1997. The tribal court denied his motion, and Means appealed. The Northern Cheyenne Court of Appeals apparently affirmed the tribal court's decision "by order ... dated June 20, 1997." On July 2, 1997, Means filed a complaint in federal district court, which he amended on July 10 to include a claim for habeas corpus relief under 25 U.S.C. § 1303. The district court treated the complaint as a petition for a writ of habeas corpus, which it denied on October 2, 1997. Shortly thereafter, on October 9, 1997, Means timely filed the instant appeal. The Tribal Court and its presiding judge, Glen Littlebird, then filed a notice of cross-appeal on October 23, 1997.
 
 II. DISCUSSION
 
 12
 Means' primary contention is that the Tribal Court does not have jurisdiction to try him for the crimes of which he stands accused. The Tribal Court, on the other hand, claims that its jurisdiction over these crimes is proper, based on the 1990 Amendments to the Indian Civil Rights Act. Since the crimes at issue are alleged to have occurred before 1990, however, the 1990 ICRA amendments will only serve as a basis for jurisdiction if they apply retroactively to conduct completed prior to the amendments' passage. If the amendments do not apply retroactively, the Tribal Court will not have jurisdiction to try Means for these crimes, and Means' petition must therefore be granted-since, as we discuss below, there is no basis for the Tribal Court's assertion of jurisdiction over Means other than the 1990 amendments to the ICRA.
 
 
 13
 A. Retroactivity of the 1990 Amendments to the Indian Civil Rights Act
 
 1. Standard of Review
 
 14
 A district court's decision on whether a statute may be applied retroactively is a question of law reviewed de novo. Chenault v. United States Postal Serv., 37 F.3d 535, 537 (9th Cir.1994). Likewise, a district court's denial of a petition for a writ of habeas corpus is reviewed de novo. Selam v. Warm Springs Tribal Correctional Facility, 134 F.3d 948, 951 (9th Cir.1998).
 
 2. Analysis
 
 15
 In determining whether a statute should be applied retroactively, the starting point must of necessity be the statute itself. Here, the statute at issue is the Indian Civil Rights Act, or ICRA, codified at 25 U.S.C. §§ 1301-1341. More specifically at issue are the 1990 amendments to 25 U.S.C. § 1301. The current text of this section is set forth below, with language added in 1990 underlined:
 
 
 16
 § 1301. Definitions
 
 
 17
 For purposes of this subchapter, the term--
 
 
 18
 (1)"Indian tribe" means any tribe, band, or other group of Indians subject to the jurisdiction of the United States and recognized as possessing powers of self-government;
 
 
 19
 (2)"powers of self-government" means and includes all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians;
 
 
 20
 (3)"Indian court" means any Indian tribal court or court of Indian offense; and
 
 
 21
 (4)"Indian" means any person who would be subject to the jurisdiction of the United States as an Indian under section 1153 of Title 18 if that person were to commit an offense listed in that section in Indian country to which that section applies.
 
 
 22
 25 U.S.C. § 1301, as amended by Pub.L. No. 101-511, § 8077 (1990) (emphasis added).
 
 
 23
 While the new language appears merely to acknowledge the existing state of the law, the 1990 amendments[4] were added by Congress in direct response to the Supreme Court case of Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). See, e.g., Impact of Supreme Court Ruling in Duro v. Reina: Hearing on S. 962, S. 963 Before the Senate Select Comm. on Indian Affairs, Senate Hearing 158, pts. 1 & 2, 102 Cong., 1st Sess. (1991). Duro had held that an Indian tribe does not have criminal jurisdiction over Indians who are not members of that tribe. Duro, 495 U.S. at 679, 110 S.Ct. 2053. Thus the amendments to the ICRA did constitute a change in the existing law.
 
 
 24
 (i) The law prior to the 1990 amendments
 
 
 25
 Immediately prior to the passage of the 1990 amendments, Duro was clearly the governing law. Prior to Duro, however, it was not clear whether Indian tribal courts could exercise criminal jurisdiction over all Indians, or just over the members of their own tribes. On the other hand, it has been clear since the late 1970s both that Indian tribes cannot exercise criminal jurisdiction at all over "non-Indians," Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 212, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), and that tribes can exercise criminal jurisdiction over their own members. United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). In Duro, the Supreme Court explicitly resolved the remaining issue of "non-member Indians," which it described as "at the intersection of these two precedents." Duro, 495 U.S. at 684, 110 S.Ct. 2053.
 
 
 26
 Duro involved a member of the Torres-Martinez Band of Mission Indians, who had been living on the Salt River Indian Reservation with his girlfriend, a member of the Salt River Pima-Maricopa Indian Community. While within Salt River's boundaries, Duro allegedly shot and killed a member of the Gila River Indian Tribe. Since both the defendant and the victim were Indians, and since the crime had occurred within Indian country, federal murder charges were brought under the authority of the Major Crimes Act, 18 U.S.C. § 1153. However, when the federal charges were dropped, charges were brought in the Pima-Maricopa Indian Community Court for the "illegal firing of a weapon on the reservation." Duro, 495 U.S. at 681, 110 S.Ct. 2053.[5]
 
 
 27
 After the tribal court refused to dismiss the charges on jurisdictional grounds, Duro filed a petition for a writ of habeas corpus in federal district court. The district court granted the writ, but a divided panel of this court reversed. Duro v. Reina, 851 F.2d 1136 (9th Cir.1988), rev'd, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). However, the Supreme Court agreed with the district court that the writ should have been granted. The Court felt that its prior cases, Oliphant and Wheeler, mandated the conclusion that Indian tribes may not exercise criminal jurisdiction over non-member Indians any more than over non-Indians.
 
 
 28
 Most of Duro is devoted to an examination of the history of tribal sovereignty, the determining factor in both Oliphant and Wheeler. The Court held that tribes do not have "retained tribal sovereignty" over non-members of the tribe, relying heavily on its earlier decisions. In Oliphant, the Court had exhaustively analyzed the history of the relations between the U.S. and various Indian tribes, and concluded that, while the tribes had originally been completely independent and self-governing sovereign political communities, their gradual subjugation to the federal government had limited many of the powers the tribes once had. While an examination of treaties and case law did not necessarily show that the power to try non-Indians had ever been explicitly taken away, it did show that such power was generally assumed (at least by whites) not to exist. In addition, the Court held that express termination by Congress was not the only way tribal powers could be constrained: "Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress and those powers 'inconsistent with their status.' " Oliphant, 435 U.S. at 208, 98 S.Ct. 1011 (quoting Oliphant v. Schlie, 544 F.2d 1007, 1009 (9th Cir.1976)). Accordingly, the Court held that the "retained" authority of tribes did not include the ability to exercise criminal jurisdiction over non-Indians, since this would be inconsistent with the tribes' status as dependent, quasi-sovereign entities.
 
 
 29
 In Wheeler, on the other hand, the Court was faced with the exercise of tribal criminal jurisdiction over tribal members. Whether the tribes had the power to try their own members was apparently never questioned-the question was where that power originated. The defendant argued that the power had been delegated to the tribes by Congress, so that the tribes, in exercising that power, were acting as arms of the federal government. Consequently, he argued, the fact that he had previously been convicted in tribal court should preclude, under double jeopardy principles, his indictment by a federal grand jury for the same offense. However, the Court held that Indian tribes had not obtained criminal jurisdiction over their own members by affirmative grant of Congress, but rather retained that ability as part of their never-relinquished sovereign power over their own internal affairs. Wheeler, 435 U.S. at 323-24, 98 S.Ct. 1079. Therefore, no double jeopardy problem was presented, since the two prosecutions were by separate sovereigns.
 
 
 30
 Thus in Duro, the Court faced the question of whether the tribes had also "retained" the inherent authority to exercise criminal jurisdiction over non-member Indians, or whether that power, too, was "inconsistent with their status." The Court reasoned that its prior holdings made clear that non-member Indians were more like non-Indians in relation to tribes other than their own-that is, both were "external" to the tribe that wished to exert criminal jurisdiction over them. Duro, 495 U.S. at 695-96, 110 S.Ct. 2053. Therefore, it was clear that the "retained inherent authority" of the tribe to exercise power over its internal affairs did not allow the tribe to exert criminal jurisdiction over any non-members, whether Indian or not. Id. at 694, 110 S.Ct. 2053. Since it is clear that Means is not a member of the tribe which is attempting to exert criminal jurisdiction over him, then, under Duro, the tribe's attempt to exercise such jurisdiction must fail.[6]
 
 
 31
 (ii) Passage of the 1990 Amendments
 
 
 32
 Within months of Duro, Congress passed Pub.L. No. 101-511, § 8077 of which amended the ICRA to "legislatively overrule" the Supreme Court's decision. While the legislative history of this section suggests that Congress did not intend to delegate such authority to the tribes, that is essentially the amendments' effect. While Congress is always free to amend laws it believes the Supreme Court has misinterpreted, it cannot somehow erase the fact that the Court did interpret the prior law. In other words, once the Supreme Court has ruled that the law is "X," Congress can come back and say, "no, the law is 'Y,' " but it cannot say that the law was never "X" or always "Y." The Court's decision is the correct statement of what the law always was, even if no one knew it until the Supreme Court so held. See Rivers v. Roadway Express, Inc., 511 U.S. 298, 313 n. 12, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994) ("[W]hen this Court construes a statute, it is explaining its understanding of what the statute has meant continuously since the date when it became law.... Thus, it is not accurate to say that the Court's decision ... 'changed' the law that previously prevailed ... when this case was filed. Rather, given the structure of our judicial system, [our] opinion finally decided what [the statute] had always meant...."). Thus regardless of Congress' intent to declare that tribes always had the inherent authority to try non-member Indians, that simply cannot be what the amendments accomplished. The only way to treat the 1990 ICRA amendments is as an affirmative delegation of jurisdiction, which may or may not apply retroactively, but which did not exist prior to 1990.[7]
 
 
 33
 Of course, if Congress could somehow negate the Supreme Court's ruling in Duro-that is, if Congress had the power to pretend (successfully) that Duro was never decided, and make the final, binding, decision on whether the tribes have always had the retained inherent authority to exercise criminal jurisdiction over non-member Indians-then the 1990 amendments would not constitute an affirmative delegation of jurisdiction. Congress would not really have done anything but acknowledge the already extant state of affairs. Thus jurisdiction would not have been imposed after the fact-on the contrary, the Tribal Court would have had jurisdiction over Means at the time he allegedly committed the crimes. There would have been no need for Congress to impose it retroactively (or prospectively, for that matter). In that case, there would be no need for any further analysis, as there would be no retroactivity question, no ex post facto question, no equal protection question, and no due process question. However, as we have discussed, Congress does not have the power to negate a Supreme Court decision. No matter how strongly Congress intended for us to "view the amendments as nullifying Duro and reinstating the criminal jurisdiction of Indian tribes over non-member Indians so that it forms an unbroken line, extending back into history," Mousseaux v. United States Comm'r of Indian Affairs, 806 F.Supp. 1433, 1443 (D.S.D.1992), we cannot do so. The 1990 amendments must be treated as an affirmative delegation of power, and must consequently be examined to determine if that affirmative delegation should be applied retroactively or not.
 
 
 34
 (iii) Whether the 1990 amendments should apply retroactively
 
 
 35
 It is clear that if Means' acts had occurred after the 1990 amendments were enacted, the amendments would govern. (That is, of course, unless the amendments would be invalid even as prospectively applied, which, as discussed in note 7, supra, might well be the case. Again, however, we do not reach this issue.) Of course, Means' alleged acts occurred prior to 1990. Thus the amendments will only govern if they are applied retroactively.
 
 
 36
 A determination of whether a statute should be applied retroactively is generally made according to the criteria set forth in Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). A major part of the Landgraf analysis turns on whether or not Congress intended for the statute at issue to apply retroactively. In holding that Congress did intend for the 1990 Amendments to be applied retroactively, the court below relied heavily on Mousseaux, which contains a thorough analysis of the legislative history of the amendments. While there is some room for disagreement as to what Congress' intent really was, and whether that intent is clearly reflected in the statute, there is no need for us to resolve that question now. Regardless of whether Congress intends a statute to be applied retroactively, we cannot so apply it if its retroactive application would be unconstitutional. And since, as discussed below, the retroactive application of the 1990 Amendments would clearly violate the Ex Post Facto Clause of the Constitution, we must hold that the 1990 Amendments to the ICRA cannot and should not be retroactively applied.
 
 
 37
 Generally, there is an ex post facto violation when a law punishes as a crime an act which was not a crime when committed, increases the punishment for a crime after its commission, or deprives a defendant of a defense available at the time the act was performed. Collins v. Youngblood, 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990). Ex post facto laws are strictly forbidden. U.S. Const. art. I, § 9, cl. 3. Thus if retroactive application of the 1990 amendments would violate the Ex Post Facto Clause, the amendments may not be applied to crimes committed before their enactment.
 
 
 38
 Appellees argue that, since the 1990 amendments are "merely jurisdictional," they do not violate the Ex Post Facto Clause. It is true that the Supreme Court has "regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed," since "[a]pplication of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.' " Landgraf, 511 U.S. at 274, 114 S.Ct. 1483 (quoting Hallowell v. Commons, 239 U.S. 506, 508, 36 S.Ct. 202, 60 L.Ed. 409 (1916)). However, this case appears to be the exception to any presumption there might be in favor of applying "jurisdictional" statutes retroactively, which, to the extent such a presumption exists, seems to have been applied mainly in civil cases, not criminal ones. See, e.g., Landgraf, 511 U.S. at 274, 114 S.Ct. 1483 (citing various cases, all civil, which involved jurisdictional statutes).
 
 
 39
 Normally, jurisdictional statutes do "simply change[ ] the tribunal that is to hear the case." Id. Here, however, allowing the Tribal Court to exercise jurisdiction does not prevent the federal courts from exercising jurisdiction as well. There is no question that the federal courts could prosecute Means for what he is alleged to have done.[8] Since each court could impose its own punishment, granting jurisdiction to the Tribal Court would effectively operate to increase the punishment for acts committed prior to passage of the statute. Prior to the 1990 amendments, Means would only have been subject to federal criminal jurisdiction, and his maximum punishment would have been equal to the maximum federal sentence for his crimes in effect at the time he committed them. If the 1990 amendments are applied retroactively, however, Means would be subject to the maximum federal penalties for his acts plus the maximum penalties the Tribal Court could impose for those same acts, which would appear to be, potentially, an additional fifteen years in jail and $75,000 in fines.[9] Thus, regardless of the fact that Means' acts would have been unlawful under federal law when he allegedly committed them, the increased punishment he would face under the subsequently "affirmed" Tribal Court jurisdiction would seem to present an ex post facto problem.
 
 
 40
 In addition to increasing the punishment, the retroactive imposition of Tribal Court jurisdiction would also seem to violate the other two strands of the Collins ex post facto test: i.e., punishing as a crime an act which was not a crime when committed, and depriving a defendant of a defense which existed when the act occurred. Collins, 497 U.S. at 52, 110 S.Ct. 2715. It is true that the acts with which Means is charged were crimes under the Tribal Code at the time they were allegedly committed. However, at the time, the Tribal Court could not have tried or punished Means for those crimes, since it lacked jurisdiction over him. Since what constitutes "a crime" is essentially what the sovereign defines as "a crime," if the sovereign has no power over an individual then it essentially lacks the ability to define any of that individual's conduct as a crime. Thus while the conduct in question here might have been a crime, it was not a crime as to Means at the time it was allegedly committed. Imposing jurisdiction retroactively therefore makes it a crime as to Means after the fact-exactly what is forbidden by the Ex Post Facto Clause.
 
 
 41
 To look at it yet another way, the retroactive application of the 1990 amendments would also deprive Means of a defense that was available at the time of his alleged crimes. The fact that the Tribal Court lacked criminal jurisdiction over Means would have been a complete defense to his prosecution by the Tribe. The fact that the 1990 amendments if applied retroactively would deprive him of this defense after the fact is yet another reason why the amendments would pose a serious ex post facto problem if applied retroactively.
 
 
 42
 Since applying the 1990 amendments retroactively would produce an ex post facto problem, then we will not do so. Whether or not we assume that Congress intended to pass this unconstitutional ex post facto law, the result is the same-the 1990 amendments cannot be applied retroactively. Of course, as we have already mentioned, there might well be problems with the 1990 amendments even as prospectively applied, but such problems must await another day for resolution.
 
 
 43
 Therefore, given the ex post facto problems that would arise were we to apply the 1990 amendments retroactively, we hold that the 1990 amendments to the ICRA should not apply retroactively to grant criminal jurisdiction to tribal courts over acts committed by non-member Indians prior to 1990. Consequently, the Northern Cheyenne Tribal Court lacks jurisdiction to try Means for the pre-1990 crimes with which he is charged, and the district court should thus have granted Means' petition for a writ of habeas corpus.
 
 
 44
 For the foregoing reasons, we reverse the district court's decision to apply the 1990 amendments retroactively, and remand to that court so Means' petition may be granted.
 
 
 45
 B. The District Court's Exercise of Jurisdiction over Means' Pre-Trial Habeas Petition
 
 
 46
 In addition to arguing that the district court was correct in denying Means' petition, the Appellees contend that the court should never have entertained the petition in the first place. Originally, Appellees contended that the district court should not have considered Means' habeas petition because he was not "detained" as required by 25 U.S.C. § 1303. However, they have now conceded that this is not the case, and that Means is sufficiently "detained" by the fact that, as conditions of his release on bail, he is forbidden from leaving the reservation and from contacting children.
 
 
 47
 Currently, Appellees' principal contention is that the district court should not have entertained Means' petition because he has not yet been tried. They acknowledge that pre-trial habeas petitions may be reviewed, but only if "special circumstances" are shown. Carden v. Montana, 626 F.2d 82, 83 (9th Cir.1980). They claim that the district court should have required Means to show that such special circumstances existed before allowing him to proceed with his petition.
 
 
 48
 While this particular issue does not appear to have been raised before in the context of the habeas remedy peculiar to the Indian Civil Rights Act, 25 U.S.C. § 1303, the general reluctance to interfere with on-going state criminal trials can generally be said to extend to tribal courts. However, this is usually examined in the context of the requirement that tribal remedies be exhausted before the federal courts will get involved. The "principles of federalism and comity" that preclude most pre-trial grants of habeas relief in state cases are reflected here in the exhaustion requirement. See Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 15 & 16 n. 8, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (holding, in the context of a civil case, that "considerations of comity direct that tribal remedies be exhausted before the question is addressed by the District Court" and that "[e]xhaustion is required as a matter of comity, not as a jurisdictional prerequisite"). Duro itself was a pre-trial habeas case, and even with all the discussion over whether the writ should have been granted, it does not appear to have been disputed that the district court's review of the petition was proper.
 
 
 49
 Our cases make clear that pre-trial relief was appropriate in these narrow circumstances. "[W]hen a tribal court attempts to exercise criminal jurisdiction over a person not a member of a tribe, no requirement of exhaustion need be enforced." Selam v. Warm Springs Tribal Correctional Facility, 134 F.3d 948, 954 (9th Cir.1998) (quoting Wetsit v. Stafne, 44 F.3d 823, 826 (9th Cir.1995)). Further, to the extent that any exhaustion was required in this case, it would appear that Means has in fact met the requirement. He presented his jurisdictional argument first to the Tribal Court, and then to the Northern Cheyenne Court of Appeals. Both courts denied his claim before he filed his petition with the district court. Since the purpose of the exhaustion requirement is to promote "tribal self-government and self-determination" by allowing tribal courts to "have the first opportunity to evaluate the factual and legal bases for the challenge to [their] jurisdiction," the requirement would appear to have been satisfied here. Iowa Mutual, 480 U.S. at 15-16, 107 S.Ct. 971. The Northern Cheyenne courts appear to have had a full opportunity to examine the jurisdictional question. Therefore, we affirm the district court's exercise of jurisdiction over Means' habeas petition.
 
 C. Conclusion
 
 50
 While we affirm the district court's exercise of jurisdiction over Means' pre-trial habeas petition, we reverse the denial of that petition, and remand so that the petition may be granted.
 
 
 51
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 REINHARDT, Circuit Judge, concurring:
 
 52
 I agree with the majority that § 1301 may not be applied retrospectively to Means. I also concur in the majority's excellent analysis of the ex post facto issue. Indeed, as the majority properly concludes, if the amendments to § 1301 were applied to Means, he would be unconstitutionally subjected to additional prosecution and heightened penalties that he was not subject to at the time the alleged crimes occurred. Because I agree with the majority's holding that retrospective application of § 1301 to Means would violate the Ex Post Facto Clause, I concur in the result, and in most of the majority's well-reasoned opinion. I conclude, however, that the district court was correct in holding that Congress clearly intended that § 1301 apply retrospectively. The language of the amendments and the legislative history evince Congress' clear intent that § 1301 would apply to cases, such as Means', in which the crimes occurred before the amendments' enactment. Accordingly, I would hold that the statute is unconstitutional to the extent that it is applicable to offenses committed prior to its enactment.
 
 
 53
 The plain language of the 1990 amendments clearly states that Congress enacted § 1301 in order to recognize the prior existence of Indian tribes' inherent criminal jurisdiction over non-member Indians. Section 1301(2) provides that the "powers of self-government" of Indian tribes "means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians." 25 U.S.C. § 1301(2). The dictionary defines the term "inherent" as a quality or characteristic that is innate, natural, or essential. See 1 The New Shorter Oxford English Dictionary 1368 def'n 2 (4th ed. 1993) ("Existing in something as an essential, permanent, or characteristic attribute or quality; forming an element of something; intrinsic, essential."). Thus, Congress' choice of the word "inherent" demonstrates clearly that it viewed criminal jurisdiction over non-member Indians as an innate power of Indian tribes which was essential to their sovereignty, not as one it was bestowing on them. The authors of the amendments also added the phrase "hereby recognized and affirmed" to § 1301(2), further demonstrating that Congress enacted the section to affirm the existence of a power the tribes already had. See 2 The New Shorter Oxford English Dictionary 2503 def'n 4 (defining "recognize" as follows: "Acknowledge the existence, legality, or validity of, esp. by formal approval or sanction"). The addition of this language directly refutes the contention that Congress intended to delegate new jurisdiction to the tribes. To the contrary, the language of the 1990 amendments clearly evinces Congress' intent to "recognize" that, notwithstanding the Supreme Court's binding determination to the contrary in Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), the Indian tribes already had jurisdiction over non-member Indians.
 
 
 54
 The legislative history of § 1301 unambiguously confirms this conclusion. First, the House and Senate reports discussing the proposed statute state, without contradiction, that the amendments were a recognition of the inherent criminal jurisdiction of tribal courts over non-member Indians and that this jurisdiction had always existed. See S.Rep. No. 168, 102nd Cong., 1st Sess. (1991) (stating that "the assumption in Congress has always been that tribal governments do have such jurisdiction, and Federal statutes reflect this view" and that the amendments were intended to "recognize and reaffirm the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians"); H.R.Rep. No. 61, 102nd Cong., 1st Sess. 1, 7 (1991) reprinted in 1991 U.S.C.C.A.N. 370, 370, 376-77 (stating that the purpose of the amendments was to "recognize and affirm the power of Indian tribes to exercise misdemeanor criminal jurisdiction over all Indians" and that the legislature "notes that tribes have retained the criminal jurisdiction over non-member Indians"); H.R.Conf.Rep. No. 261, 102nd Cong., 2nd Sess. 3 (1991) reprinted in 1991 U.S.C.C.A.N. 379 (stating that the "legislation clarifies and reaffirms the inherent authority of tribal governments to exercise criminal jurisdiction over all Indians on their reservations"); 137 Cong.Rec. H2988-02 (statement of Rep. Geo. Miller of California) (stating that "this bill recognizes an inherent tribal right which always existed. It is ... an affirmation that tribes retain all rights not expressly taken away. Since Congress never took this jurisdiction away, we assert that the jurisdiction exists and must be recognized"); and 137 Cong.Rec. H2988-02 (report on H.R. 972) (stating that the amendments seek "to assure Indian tribes of their jurisdiction over misdemeanor crimes committed on their lands by Indians who are not members of their tribe. The Committee is clarifying an inherent right which tribal governments have always held and was never questioned").
 
 
 55
 Second, the legislative history states that proposed § 1301 was not intended to be a delegation of jurisdiction to Indian tribes. See H.R.Conf.Rep. No. 261 (stating that "the Committee of the Conference notes that ... this legislation is not a delegation of this jurisdiction"); H.R.Rep. No. 61 (stating that "this legislation is not a federal delegation of this jurisdiction but a clarification of the status of tribes as domestic dependent nations"); 137 Cong.Rec. H2988-02 (statement of Rep. Geo. Miller of California) (stating that "the proposed bill is not a delegation of authority but an affirmation that tribes retain all rights not expressly taken away").
 
 
 56
 In light of the uncontradicted legislative pronouncements, I believe we are compelled to conclude that in adopting the amendments to § 1301, Congress did not intend to delegate jurisdiction to the tribes, but rather viewed the amendments as an affirmation of the jurisdiction that the tribes had always retained. See Mousseaux v. United States Comm'r of Indian Affairs, 806 F.Supp. 1433 (D.S.D.1992) (offering same interpretation of § 1301 and its legislative history) aff'd in part on other grounds and remanded in part, 28 F.3d 786 (8th Cir.1994); see also Nell Jessup Newton, Permanent Legislation to Correct Duro v. Reina, 17 Am. Indian L.Rev. 109, 118-20 (noting that the legislative history contained "strong language" that the legislation was not a delegation of new tribal authority but rather a reaffirmation of the power that tribes already had).
 
 
 57
 The plain language and legislative history of the amendments evince Congress' clear intent that § 1301 serve as a confirmation of the tribes' pre-existing jurisdiction, and not as a delegation of such jurisdiction. In short, Congress clearly intended the 1990 amendments to constitute a "clarification" of what it believed the law already was, and thus to be applicable to all cases, past, present and future. Accordingly, I would hold that the statute, on its face, applies retrospectively. Therefore, under the terms of § 1301, Means is subject to prosecution in the Northern Cheyenne Tribal Court for offenses committed prior to the adoption of the amendments.
 
 
 58
 As the majority correctly observes, however, the application of § 1301 to Means would constitute a violation of his constitutional rights under the Ex Post Facto Clause. See Majority opinion at 9531-35 ("Imposing jurisdiction retroactively therefore makes it a crime as to Means after the fact-exactly what is forbidden by the Ex Post Facto Clause." Id. at 9534.). Rather than repeat or attempt to improve upon the majority's thorough analysis of this point, I simply note that applying the 1990 amendments to Means, in conformance with the plain meaning of § 1301, would not only subject him to prosecution in an additional jurisdiction but also increase the maximum penalty he could receive by up to fifteen years and a $75,000 fine. To place Means at risk of enhanced penalties that he was not subject to at the time the crimes were committed would certainly constitute an ex post facto violation.
 
 
 59
 Because I conclude that the statute is unconstitutional to the extent that it applies to offenses committed prior to its enactment, and because its application to Means and others whose offenses occurred prior to that time violates the Ex Post Facto Clause, I concur generally in the conclusion reached by the majority.[1]
 
 
 
 *
 The Honorable Edward C. Reed, Jr., Senior District Judge for the District of Nevada, sitting by designation
 
 
 [1]
 Under the Indian Civil Rights Act ("ICRA"), Indian tribal courts are currently forbidden from imposing a penalty of more than one year in jail plus a $5000.00 fine for "conviction for any one offense." 25 U.S.C. § 1302(7). Prior to 1986 the maximum penalty under the ICRA was six months in jail plus a $500.00 fine. Pub.L. No. 90-284, Title II, § 202, 82 Stat. 77 (1968), amended by Pub.L. 99-570, Title IV, § 4217, 100 Stat. 3207-146 (1986). It is unclear how many of the fifteen counts with which Means is charged occurred before 1986. If all fifteen counts occurred before 1986, Means would face a maximum total penalty of seven and a half years in jail, plus a $7500 fine. If all fifteen counts occurred after 1986, on the other hand, he would face a maximum penalty of fifteen years and a $75,000 fine
 
 
 [2]
 This is Means' own description of his tribal membership. Nothing in the record gives independent support to this statement. However, the parties all seem to agree that Means is an Indian, but is not a member of the Northern Cheyenne Tribe. As the Tribal Court would unquestionably have criminal jurisdiction over Means if he were a member of the Northern Cheyenne Tribe, United States v. Wheeler, 435 U.S. 313, 322, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), the Tribal Court would surely have attempted to show that Means was a member of the Northern Cheyenne Tribe if that were true. Likewise, as tribal courts clearly do not have criminal jurisdiction over non-Indians, Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 212, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), we can assume that Means would have contested his status as an Indian if that were possible
 
 
 [3]
 "Indian country" is defined in 18 U.S.C. § 1151, and includes primarily all land within the boundaries of Indian reservations
 
 
 [4]
 The original 1990 amendments to § 1301 contained a sunset provision which caused the changes to lapse after one year. However, the amendments were re-enacted in the same form after a gap of only a few days, Pub.L. No. 102-137, 105 Stat. 646 (1991), and still represent the current law. Thus we will continue to refer to the changes as the 1990 amendments
 
 
 [5]
 As discussed above, the ICRA severely limits the punishment a tribe can impose. At the time, the limit was six months in jail and a $500 fine. Effectively, this limits a tribe's ability to prosecute to misdemeanors-although, as here, tribal authorities will often seek to prosecute lesser included offenses of serious crimes, because otherwise the offenders would receive no punishment at all. See L. Scott Gould, The Congressional Response to Duro v. Reina: Compromising Sovereignty and the Constitution, 28 U.C. Davis L.Rev. 53, 155 n. 400 (1994) (noting that "the tribes prosecuted offenses such as [murder] as misdemeanors for the simple reason that the crimes would otherwise go unpunished")
 
 
 [6]
 Of course, it is also true that Means' alleged crimes took place prior to the Duro decision. However, no one questions that Duro should apply retroactively. See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993) ("When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule."). Thus it is clear that, unless the ICRA amendments apply retroactively, the Tribal Court's jurisdiction over Means must be determined in accordance with Duro
 
 
 [7]
 It is quite likely that Congress chose the "recognized and affirmed" language in an effort to avoid potential Constitutional problems that might be implicated by an affirmative delegation of jurisdiction, even when only applied prospectively. Duro makes it clear that non-Indians and non-member Indians are similarly situated in regard to tribal courts' exercise of criminal jurisdiction, Duro, 495 U.S. at 696, 110 S.Ct. 2053, so any grant of jurisdiction to tribes by Congress over non-member Indians but not over non-Indians might well present a serious equal protection problem. In addition, Duro also hints that any affirmative grant of criminal jurisdiction over non-members-whether Indian, non-Indian, or both-by Congress to Indian tribal courts, which are not subject to the Bill of Rights or other constitutional restraints, would be a violation of the Due Process Clause. Duro, 495 U.S. at 693, 110 S.Ct. 2053 (stating that "[o]ur cases suggest constitutional limitations even on the ability of Congress to subject American citizens to criminal proceedings before a tribunal that does not provide constitutional protections as a matter of right"). However, since we find that the amendments should not be retroactively applied to Means' alleged crimes, we do not reach the question of whether the amendments are unconstitutional even when prospectively applied
 
 
 [8]
 Federal criminal jurisdiction is imposed by the Major Crimes Act, 18 U.S.C. § 1153, which provides that "[a]ny Indian who commits against the person or property of another Indian or other person any of [certain specified serious crimes] within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States." 18 U.S.C. § 1153
 
 
 [9]
 But see note 1, supra, discussing fact that for crimes committed prior to 1986 Indian tribes could only impose up to six months in jail plus a $500 fine for each count of conviction. Still, even if all crimes at issue were committed prior to 1986, Means would be subject to an additional seven and a half years in jail and $7500 in fines
 
 
 [1]
 As Judge Reed's opinion for the court points out, we do not consider the constitutionality of the statutory amendments in general. I agree, however, that if and when we examine that question in a case in which the amendments are applied prospectively, they should be treated as effectively delegating or granting authority, notwithstanding Congress' effort to cast its actions differently. The alternative, that we strike the amendments in their entirety, is both undesirable and unnecessary. I have no doubt that Congress would have preferred to have a prospective statute rather than none at all. See Regan v. Time, Inc., 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) ("A ruling of unconstitutionality frustrates the intent of the elected representatives of the people. Therefore, a court should refrain from invalidating more of the statute than is necessary.")