**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Michael L. ENAS, Defendant–Appellee.**

**No. 99–10049.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 1999

Rehearing En Banc Granted Feb. 28, 2000

Argued and Submitted Sept. 20, 2000

En Banc Opinion Filed June 29, 2001

Richard A. Friedman, United States Department of Justice, Washington, D.C., for plaintiff-appellant United States.

Sigmund G. Popko, Assistant Federal Public Defender, Phoenix, Arizona, for defendant-appellee Michael L. Enas.

Before: PREGERSON, O'SCANNLAIN, TROTT, T.G. NELSON, KLEINFELD, TASHIMA, THOMAS, SILVERMAN, MCKEOWN, W. FLETCHER, and TALLMAN, Circuit Judges.

Opinion by Judge McKEOWN; Concurrence by Judge PREGERSON.

McKEOWN, Circuit Judge:

This case sits at the intersection of two complicated bodies of law: the dual sovereignty exception to double jeopardy, and the sovereign power of Indian tribes. We must determine whether an Indian tribe and the federal government may twice prosecute a "non-member Indian"[1] for the same conduct without offending the Double Jeopardy Clause. Our answer lies in the distinction between the "inherent" and "delegated" power of Indian tribes. If the tribe was acting pursuant to its inherent power when it prosecuted Enas, then the dual prosecutions were undertaken by separate sovereigns, and were therefore constitutionally permissible. If, however, the tribe was exercising power delegated by Congress, then it was acting as an "arm of the federal government," *United States v. Wheeler*, 435 U.S. 313, 328, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), rather than employing its own sovereign authority, and the federal prosecution is barred. We conclude that under the 1990 amendments to the Indian Civil Rights Act, Indian tribes prosecute non-member Indians pursuant to their inherent power. Therefore, the

---

1. A predicate word about terminology is necessary. The Supreme Court has recognized three categories of criminal defendants in tribal court: "members" (of the prosecuting tribe), "non-member Indians," and "non-In- dians." *Duro v. Reina*, 495 U.S. 676, 684–85, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). As discussed below, tribes exercise different forms of power over these classes of defendants.

twin prosecutions were constitutional, and we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The seeds of this litigation were planted on August 18, 1994, when Defendant–Appellee Michael L. Enas stabbed Joseph Kessay while on reservation land governed by the White Mountain Apache Tribe ("the Tribe"). Enas is an enrolled member of the San Carlos Apache Tribe (and therefore is a "non-member Indian" vis-a-vis the Tribe); Kessay is an enrolled member of the Tribe. The Tribe charged Enas with assault with a deadly weapon, and assault with intent to cause serious bodily injury, violations of Tribal Code sections 2.4 and 2.6. One day after the assaults, Enas pled guilty to the former charge, and was sentenced to 180 days in jail and fined $1180. About two weeks later, while on a work-release program, Enas failed to return to custody.

On June 21, 1995, during the time that Enas was on escape status, a federal grand jury returned new charges stemming from the stabbing. Enas was indicted for assault with a dangerous weapon, and assault resulting in serious bodily injury. *See* 18 U.S.C. §§ 113(c), 113(f), 1153.[2] The parties do not dispute that the indictment charged the same conduct for which Enas had already been prosecuted, convicted, and sentenced by the tribal court. On Enas's motion, the district court dismissed the federal indictment. Relying on our decision in *Means v. Northern Cheyenne Tribal Court*, 154 F.3d 941 (9th Cir.1998), the district court held that the Tribe prosecuted Enas pursuant to power delegated by Congress; that the Tribe was "the same sovereign as the United States" for

purposes of the prosecution; and that, therefore, the Double Jeopardy Clause barred the federal government from prosecuting Enas in federal court.

A three-judge panel of this court reversed the district court. We took this case en banc in order to examine the interplay among the Supreme Court's decision in *Duro v. Reina*, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990); *Means;* the ICRA; and the circumstances of this case. *See United States v. Enas*, 204 F.3d 915 (9th Cir.), *withdrawn and reh'g en banc granted*, 219 F.3d 1138 (9th Cir.2000). We review de novo the various questions of law presented here. *See United States v. Byrne*, 203 F.3d 671, 673 (9th Cir.2000) (double jeopardy); *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1182 (9th Cir.2000) (statutory interpretation).

## II. DISCUSSION

## A. THE DOUBLE JEOPARDY CLAUSE AND THE DUAL SOVEREIGNTY EXCEPTION

■ The Double Jeopardy Clause provides that "[n]o person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This constitutional guarantee provides three forms of protection: It prohibits "a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense." *Dep't of Revenue v. Kurth Ranch*, 511 U.S. 767, 769 n. 1, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994).

■ The Double Jeopardy Clause, however, contains a significant exception. Multiple prosecutions are permissible when they are carried out by separate

---

**2.** Subsections 113(c) and 113(f) have since been recodified at 18 U.S.C. § 113(a)(3) and (a)(6), respectively.

sovereigns. The rationale for this principle rests with our traditional conception of what constitutes a "crime." At common law, a crime was defined as "an offense against the sovereignty of the government." Thus, a single act that violates the laws of two sovereigns constitutes two separate crimes. As a result, successive prosecutions by multiple sovereigns for that single act do not violate the Double Jeopardy Clause. *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985).

■ Our task, then, is to determine whether the two entities that prosecuted Enas are "separate sovereigns" for purposes of the prosecution. In order to do so, we must identify "the ultimate source of the power under which the respective prosecutions were undertaken." *Wheeler,* 435 U.S. at 320, 98 S.Ct. 1079; *accord Heath,* 474 U.S. at 88, 106 S.Ct. 433. In certain contexts, this analysis is fairly simple. For instance, it is clearly established that state and federal governments each prosecute pursuant to their own sovereign power. Thus, multiple prosecutions among these entities are permissible. A federal prosecution may follow a state prosecution for the same acts. *United States v. Lanza,* 260 U.S. 377, 382, 43 S.Ct. 141, 67 L.Ed. 314 (1922) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace and dignity of both and may be punished by each."). Likewise, one state may prosecute crimes already punished by another. *Heath,* 474 U.S. at 89, 106 S.Ct. 433. By contrast, the Double Jeopardy Clause prohibits successive prosecutions by federal and territorial governments, because "the territorial and federal laws and the courts, whether exercising federal or local jurisdiction, are creations emanating from the same sovereignty." *Puerto Rico*

*v. Shell Co. (P.R.), Ltd.,* 302 U.S. 253, 264, 58 S.Ct. 167, 82 L.Ed. 235 (1937).

This inquiry into the source of the prosecuting power becomes somewhat more complicated in the context that confronts us here—namely, the nature and scope of tribal sovereign power. We turn now to that subject.

## B. TRIBAL SOVEREIGNTY, "INHERENT POWER," AND "DELEGATION"

■ Indian tribes pose special concerns in the context of double jeopardy. The difficulty arises because Indian tribes exercise multiple forms of power, stemming from different sources, that have different implications for double jeopardy. On the one hand, the tribes are autonomous sovereigns. As such, they retain all power that is not "inconsistent with their status" as "conquered and dependent" nations. *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 196, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). This form of authority, described as "inherent," *Wheeler,* 435 U.S. at 323, 98 S.Ct. 1079, or "retained," *id.* at 327, 98 S.Ct. 1079; *Duro,* 495 U.S. at 679, 110 S.Ct. 2053, comprises the power "needed to control [the tribes'] own internal relations, and to preserve their own unique customs and social order," *Duro,* 495 U.S. at 685–86, 110 S.Ct. 2053.

■ On the other hand, tribal autonomy is not sovereignty in the ordinary sense. It "exists only at the sufferance of Congress and is subject to complete defeasance." *Wheeler,* 435 U.S. at 323, 98 S.Ct. 1079. Congress can limit tribal power and, conversely, can add to it. When Congress bestows additional power upon a tribe—augments its sovereignty, one might say—this additional grant of power is referred to as "delegation." *Duro,* 495 U.S. at 687, 110 S.Ct. 2053; *Wheeler,* 435

U.S. at 328, 98 S.Ct. 1079; *Oliphant,* 435 U.S. at 208, 98 S.Ct. 1011.

■ This dichotomy between inherent and delegated power has important implications for double jeopardy. When a tribe exercises inherent power, it flexes its own sovereign muscle, and the dual sovereignty exception to double jeopardy permits federal and tribal prosecutions for the same crime. By contrast, when a tribe exercises power delegated to it by Congress, the Double Jeopardy Clause prohibits duplicative tribal and federal prosecutions. The Supreme Court has been consistent in maintaining the distinction between inherent and delegated power, and in holding that these two forms of power have different consequences for double jeopardy. Thus, in *Wheeler,* the Court considered dual sovereignty double jeopardy in the context of a tribe's criminal prosecution of a tribal member. In so doing, it described the question before it as follows:

> [The tribe's] right of internal self-government includes the right to prescribe laws applicable to tribe members and to enforce those laws by criminal sanctions.... [T]he controlling question in this case is the source of this power to punish tribal offenders: Is it a part of inherent tribal sovereignty, or an aspect of the sovereignty of the Federal Government which has been delegated to the tribes by Congress?

435 U.S. at 322, 98 S.Ct. 1079 (internal citations omitted). Inherent power would permit the dual prosecutions; delegated power would not. The Court drove the point home later in *Wheeler:*

> In sum, the power to punish offenses against tribal law committed by Tribe members, which was part of the Navajos' primeval sovereignty, has never been taken away from them, either explicitly or implicitly, and is attributable in no way to any delegation to them of

federal authority. It follows that when the Navajo Tribe exercises this power, it does so as part of its retained sovereignty and not as an arm of the Federal Government.

*Id.* at 328, 98 S.Ct. 1079 (footnotes omitted). Indeed, the Court in *Duro* described *Wheeler* as drawing precisely this distinction:

> Had the prosecution [in *Wheeler* ] been a manifestation of external relations between the Tribe and outsiders, such power would have been inconsistent with the Tribe's dependent status, and could only have come to the Tribe by delegation from Congress, subject to the constraints of the Constitution.

*Duro,* 495 U.S. at 686, 110 S.Ct. 2053; *see also* Nell Jessup Newton, *Permanent Legislation To Correct Duro v. Reina,* 17 Am. Indian L.Rev. 109, 112 (1992) ("Everyone assumes Congress could have created new law by delegating federal power to tribes to try nonmember Indians.... [But] if the delegatee has no power in a particular area, the delegatee exercises the power of the person doing the delegation."); *cf.* Felix S. Cohen, *Handbook of Federal Indian Law* 231 (1982 ed.) ("Perhaps the most basic principle of all Indian law ... is that those powers which are lawfully vested in an Indian tribe are not, in general, *delegated* powers granted by express acts of Congress, but rather '*inherent* powers of a limited sovereignty which has never been extinguished.' " (emphasis added) (quoting *Wheeler,* 435 U.S. at 322–23, 98 S.Ct. 1079)).

■ Thus, the question before us here is whether the White Mountain Apache Tribe prosecuted Michael Enas pursuant to its inherent sovereign power, or instead pursuant to power delegated to it by Congress. If it exercised inherent power, the federal prosecution can go forward; if it employed delegated power, the federal

prosecution is barred. The answer to this question lies in *Duro*, and the 1990 amendments to the Indian Civil Rights Act (ICRA) that sought to address that decision.

## C. *DURO*, THE ICRA, AND INHERENT POWER

*Duro* is the most recent in a line of cases in which the Supreme Court has examined the nature of tribal criminal jurisdiction over various categories of defendants. Prior to *Duro*, the Court had held that tribal courts do not have inherent criminal jurisdiction to prosecute non-Indians, *Oliphant*, 435 U.S. at 208, 98 S.Ct. 1011, but that they do have inherent jurisdiction to prosecute tribal members, *Wheeler*, 435 U.S. at 323–24, 98 S.Ct. 1079. In *Duro*, the Supreme Court considered "whether an Indian tribe may assert criminal jurisdiction over a defendant who is an Indian but not a tribal member." 495 U.S. at 679, 110 S.Ct. 2053. It concluded that tribes do not possess this form of sovereign authority. *Id.* at 685, 110 S.Ct. 2053.

In reaching this conclusion, the Court undertook the historical approach previously employed in *Wheeler*, examining whether this was a form of power that was "necessarily divested" at the time of the tribe's "incorporation within the territory of the United States." *Wheeler*, 435 U.S. at 322, 98 S.Ct. 1079. The Court concluded that the power to prosecute nonmember Indians "was a power necessarily surrendered by the tribes in their submission to the overriding sovereignty of the United

States." *Duro*, 495 U.S. at 693, 110 S.Ct. 2053; *see also id.* at 685–88, 110 S.Ct. 2053 (discussing tribal sovereignty and divestment of power). That is, the Court concluded that the tribes' inherent authority never included such powers.

The historical nature of the Court's inquiry bears emphasis. Throughout *Duro*, the Court used terms with a temporal component. It spoke of "retained sovereignty," *id.* at 685, 108 S.Ct. 1496, "retained tribal power," *id.*, and the "sovereignty which the Indians implicitly lost," *id.* at 686, 108 S.Ct. 1496. Much of the Court's analysis was explicitly historical. The Court considered the history of tribal jurisdiction at length, pointing to various federal jurisdictional statutes, the courts of Indian offenses, and the history of tribal courts. *Id.* at 688–91, 108 S.Ct. 1496. This approach was not surprising, as *Duro* chiefly relied on two earlier cases—*Wheeler* and *Oliphant*—that employed a similarly historical methodology. In evaluating the reach of tribal criminal jurisdiction over members and non-Indians, respectively, both cases relied extensively on the history of tribal jurisdiction. *See Wheeler*, 435 U.S. at 323–26, 98 S.Ct. 1079; *Oliphant*, 435 U.S. at 196–208, 98 S.Ct. 1011. And in both cases, the Supreme Court looked to the necessarily-historical question of "implicit divestiture." *Wheeler*, 435 U.S. at 326, 98 S.Ct. 1079; *Oliphant*, 435 U.S. at 208–10, 98 S.Ct. 1011; *see also Means*, 154 F.3d at 945 ("Most of *Duro* is devoted to an examination of the history of tribal sovereignty, the determining factor in both *Oliphant* and *Wheeler*.").[3]

---

**3.** The concurrence puts a very different spin on *Duro*. According to the concurrence, *Duro* was not an historical examination of tribal sovereignty, but "a snapshot of the tribal sovereignty vessel as it existed at the time *Duro* was decided." Concurrence at 680. Such an interpretation fails to give due regard to the lengthy historical analysis that undergirds

*Duro.* 495 U.S. at 688–91, 110 S.Ct. 2053. Indeed, the inquiry into the interaction between tribal sovereignty on the one hand, and state or federal sovereignty on the other, has always been historical in nature. *See, e.g., Wheeler*, 435 U.S. at 323–26, 98 S.Ct. 1079; *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832); *Johnson v. M'Intosh*, 21

Using this methodology, the Court in *Duro* determined that Indian tribes lack criminal jurisdiction over nonmember Indians. While the Court was at times equivocal, 495 U.S. at 688–89, 110 S.Ct. 2053 ("[t]he historical record in this case ... *tends to support* the conclusion we reach" (emphasis added)), and even acknowledged that the historical record was not crystal clear, *id.* at 691, 110 S.Ct. 2053 ("Evidence on criminal jurisdiction over nonmembers is less clear, but on balance supports the view that inherent tribal jurisdiction extends to tribe members only."), it nonetheless concluded that the tribes did not possess criminal jurisdiction over nonmembers as part of their inherent authority.

Congress reacted swiftly. In 1990, the same year that *Duro* was decided, Congress enacted amendments to the Indian Civil Rights Act that were intended to override *Duro.* Prior to those amendments, the ICRA had defined tribal "powers of self-government" as

> all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses.

25 U.S.C. § 1301(2) (1990). The 1990 amendments modified this definition to include

> all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses; *and means the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over all Indians.*

U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). To reduce *Duro* to a "snapshot" is to disregard

25 U.S.C. § 1301(2) (2000) (emphasis added).

This statute was intended to override *Duro* in two separate ways. First, tribes would now have jurisdiction over nonmember Indians. This is clear from the last clause of the amendment, which defines "powers of self-government" to include power "over all Indians." *Id.*

Second, important for our purposes here, Congress intended to replace *Duro*'s historical narrative—according to which the tribes had no power over nonmember Indians—with a different version of history that recognized such power to be "inherent." Presumably for similar reasons, Congress also made clear that these amendments were not a congressional delegation of authority, but rather a recognition of power that always existed; in other words, inherent powers that were "never ... extinguished," *Wheeler,* 435 U.S. at 322, 98 S.Ct. 1079. This intention is explicit in the statutory text, and permeates the legislative history. *See, e.g.,* 137 Cong. Rec. H2988–02 (daily ed. May 14, 1991), 1991 WL 77806 (statement of Rep. Miller) ("[T]his bill recognizes an inherent tribal right which always existed. It is not a delegation of authority but an affirmation that tribes retain all rights not expressly taken away."); H.R. Conf. Rep. No. 102–261, at 3 (1991), *reprinted in* 1991 U.S.C.C.A.N. 379, 379 ("The Committee of Conference is clarifying an inherent right which tribal governments have always held and was never questioned until the recent Supreme Court decision of *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053 (1990)."); *see also United States v. Weaselhead,* 156 F.3d 818, 823 (8th Cir.1998) ("These post-*Duro* amendments reflect an attempt by Con-

this interpretive methodology.

gress to rewrite the fundamental principles upon which *Duro, Oliphant,* and *Wheeler* were based by redefining the Indian tribes' 'inherent' sovereign status as having always included criminal jurisdiction over nonmember Indians."), *vacated by an equally divided court,* 165 F.3d 1209 (8th Cir.1999) (en banc); *Means,* 154 F.3d at 950–51 (Reinhardt, J., concurring) (reviewing legislative history); *Mousseaux v. United States Comm'r of Indian Affairs,* 806 F.Supp. 1433, 1442–43 (D.S.D.1992) (same).

■ In short, *Duro* squarely conflicts with the 1990 amendments to the ICRA. The Supreme Court said that Indian tribes did not have inherent criminal jurisdiction over nonmember Indians; Congress said that they did. *See Weaselhead,* 156 F.3d at 823 ("[W]e are presented with a legislative enactment purporting to recast history in a manner that alters the Supreme Court's stated understanding of the organizing principles by which the Indian tribes were incorporated into our constitutional system of government."). Thus, the critical question in this case is whether Congress had the power to enact its vision of tribal sovereignty, one that was at odds with the Supreme Court's historical narrative. *Cf.* Philip S. Deloria & Nell Jessup Newton, *Federal Criminal Jurisdiction of Tribal Courts over Non–Member Indians,* 38 Fed. B. News & J. 70, 73 (Mar.1991) ("The [1990 amendments] raise[ ] complex and subtle issues of constitutional law, especially relating to separation of powers."). Here the notion of revisionist history takes on legal consequences. For the reasons

that follow, we conclude that in this narrow context, Congress did have this power.

With that in mind, we pause to note the relationship between our reasoning and that of the concurrence. In reaching our conclusion about Congress' power, we arrive at the same ultimate result as the concurrence, albeit by a different route. We both agree that Congress has the authority to identify the parameters of tribal sovereignty. The concurrence concludes, however, that a separation of powers analysis is unnecessary because Congress (in the 1990 amendments) and the Supreme Court (in *Duro* ) are not necessarily in conflict over the scope of tribal sovereignty. The historical record is of no import here, it contends, because "Congress could recognize and confirm inherent tribal power for the first time in the 1990 amendments, and the tribes would still be exercising their own 'inherent' sovereign power, rather than 'delegated' federal power.'" Concurrence at 16 n. 8.

But this analysis collapses the distinction between inherent and delegated power. The concurrence would hold that a power *never* previously possessed by a tribe—not in 1787, not at the time of the tribe's conquest, not at the time the tribe was first recognized by the federal government, and not today—could be bestowed upon the tribe tomorrow by Congress and still be termed "inherent." If a power first created tomorrow can be designated as "inherent," then what power would ever be "delegated?" Put simply, none. Under *Duro* and *Wheeler,* this cannot be correct.[4]

---

4. Nor is it enough to say that there is "nothing new about the idea that the federal government may authorize a new power that is 'inherent' in another sovereign." Concurrence at 679 n. 4. To illustrate this proposition, the concurrence points to the creation of a new state, or a new tribe. This begs the question. There is a significant difference

between creating a new sovereign that has certain inherent powers, and recognizing powers that are labeled "inherent." The examples listed by the concurrence speak to the former; our case concerns the latter. It is of course true that a sovereign—even a new one—possesses those powers that are inherent in the nature of its sovereignty. So, for

Although the line between inherent and delegated powers is a fuzzy one, and at times seems to collapse, we are nonetheless required by Supreme Court precedent to recognize this line; to implement the historical inquiry described above; and, as a result, to consider the respective powers of Congress and the courts with regard to this dispute.

## D. *MEANS V. NORTHERN CHEYENNE TRIBAL COURT AND UNITED STATES V. WEASELHEAD*

Before dipping our own toes into this maelstrom of institutional prerogatives, we pause to consider the handful of published opinions in which courts—others, as well as our own—have considered the relationship between *Duro* and the 1990 amendments. Few of these decisions have taken the same approach, and each of the appellate panels has been divided, suggesting the underlying difficulty of the issue.

We first examined the interplay between *Duro* and the 1990 amendments to the ICRA in *Means*, albeit in a slightly different context—that is, whether the 1990 amendments applied retroactively to pre–1990 criminal conduct. Looking to *Duro*, *Oliphant* and *Wheeler*, we considered the nature and sources of tribal sovereignty and determined, for reasons substantially similar to those set forth above, that the Supreme Court's analysis of inherent and

delegated tribal power was essentially historical. *Id.* at 945. Congress, we concluded, intended the 1990 amendments "to 'legislatively overrule' the Supreme Court's decision." *Id.* But, we explained, Congress could not do so:

> While the legislative history of [the 1990 amendments] suggests that Congress did not intend to *delegate* ... to the tribes [the authority to prosecute non-member Indians], that is essentially the amendments' effect. While Congress is always free to amend laws it believes the Supreme Court has misinterpreted, it cannot somehow erase the fact that the Court did interpret the prior law. In other words, once the Supreme Court has ruled that the law is "X," Congress can come back and say, "no, the law is 'Y,'" but it cannot say that the law was *never* "X" or *always* "Y." ... Thus, regardless of the Congress' intent to declare that the tribes *always* had the inherent authority to try non-member Indians, that simply cannot be what the amendments accomplished.

*Id.* at 946 (internal citations omitted). Thus, the panel concluded, the amendments must be treated as a delegation of jurisdiction. *Id.*[5] It then went on to hold that the 1990 amendments may not apply retroactively, because retroactive application would . violate the Ex Post Facto clause by "increas[ing] the punishment for a crime after its commission," and by

---

instance, under the equal footing doctrine, a state newly admitted to the United States possesses the powers inherent in the notion of a "state." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 204, 119 S.Ct. 1187, 143 L.Ed.2d 270 (1999) (referring to the "fundamental attributes of state sovereignty"); *Coyle v. Smith*, 221 U.S. 559, 570, 31 S.Ct. 688, 55 L.Ed. 853 (1911) (referring to the "necessary attributes [of] an independent sovereign government" (quoting *Withers v. Buckley*, 61 U.S. (20 How.) 84, 92, 15 L.Ed.

816 (1857))). But to say that a state—or, in our case, a tribe—inherently possesses certain powers merely sets the stage for the question that confronts us here: *Which* powers are inherent in that body?

5. In light of this reasoning, the district court's conclusion in the case before us—that the Double Jeopardy Clause bars the federal government's prosecution of Enas—was certainly understandable. That conclusion followed logically from *Means*.

"punish[ing] as a crime an act which was not a crime when committed." *Id.* at 947 (citing *Collins v. Youngblood,* 497 U.S. 37, 52, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990)).[6]

The Eighth Circuit also interpreted the interplay between *Duro* and the 1990 amendments, to similarly fractured effect. *United States v. Weaselhead* presented the same issue that confronts us here—whether tribal criminal jurisdiction over nonmember Indians stems from inherent or delegated authority, and the implications of that determination for the dual sovereignty exception to double jeopardy. The case began in the District of Nebraska, where criminal defendant Robert Weaselhead sought to dismiss a federal indictment on double jeopardy grounds because he had previously been prosecuted in tribal court. 36 F.Supp.2d 908, 910 (D.Neb. 1997). After examining tribal sovereignty in light of *Duro, Wheeler, Oliphant* and the 1990 amendments, the district court concluded that *Duro* and *Oliphant* were based on "a historical legislative background." That is, those cases sought to determine legislative intent. *Id.* at 914. Therefore, the decisions were a matter of federal common law, and Congress had the power to override *Duro* 's historical claims by means of the 1990 amendments:

> It is axiomatic that the legitimacy of the federal common law is contingent upon the presence of a connection, however tenuous, to a determination of congressional intent. Accordingly, if a judicial body errs in determining congressional intent, Congress can permissibly legislate a correction. [The 1990 amendments] constitute[ ] such a correction.

6. Judge Reinhardt reached a different conclusion as to the effect of the 1990 amendments. Looking to the language and legislative history of the amendments, he concluded that "Congress did not intend to delegate jurisdiction to the tribes"; rather, he determined,

*Id.* As in *Means,* the district court concluded that the intent of the 1990 amendments was clear, namely to override *Duro,* but reached the opposite conclusion about Congress's power to pass such legislation—it held that Congress did have such power. The court went on to hold that, because the tribal prosecution was brought pursuant to inherent tribal power, the federal and tribal prosecutions were conducted by separate sovereigns, and the Double Jeopardy Clause was not violated. *Id.* at 915.

A divided panel of the Eighth Circuit reversed. The court agreed with the district court that Congress intended to "redefin[e] the Indian tribes' 'inherent' sovereign status as having always included criminal jurisdiction over nonmember Indians." 156 F.3d 818, 823 (8th Cir.1998). Unlike *Means* or the district court, however, the *Weaselhead* majority determined that the nature of tribal sovereignty had constitutional dimensions. As such, it held that the last word rested with the Supreme Court, rather than Congress:

> We conclude that ascertainment of first principles regarding the position of Indian tribes within our constitutional structure of government is a matter ultimately entrusted to the Court and thus beyond the scope of Congress's authority to alter retroactively to legislative fiat. Fundamental, *ab initio* matters of constitutional history should not be committed to "[s]hifting legislative majorities" free to arbitrarily interpret and reorder the organic law as public sentiment veers in one direction or another.

Congress clearly intended to "recognize" that Indian tribes always had jurisdiction over non-member Indians, *Duro* notwithstanding. *Id.* at 950–51, 108 S.Ct. 1496 (Reinhardt, J., concurring).

*Id.* at 824 (quoting *City of Boerne v. Flores,* 521 U.S. 507, 529, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)).

Judge Morris Sheppard Arnold dissented, disagreeing with the majority about the constitutional nature of tribal sovereignty and, therefore, about the ultimate result. First, he determined that the size and shape of tribal sovereignty has no constitutional basis. Pointing to *Cherokee Nation v. Georgia,* Judge Arnold noted that "Chief Justice Marshall made no intimation that the Constitution had anything to say on the question of whether Indian tribes are states. The Constitution is simply silent on the matter and on the related question of inherent Indian sovereignty." 156 F.3d 818, 825 (M.S.Arnold, J., dissenting) (citing 30 U.S. (5 Peters) 1, 16–19, 8 L.Ed. 25 (1831)). As a result, "These are matters that are to be decided by reference to governmental custom and practice and to the general principles of the *jus gentium.*" *Id.* Thus, he concluded, "the question of what powers Indian tribes inherently possess, as the district court recognized, has always been a matter of federal common law," so therefore, "Congress has the power to expand and contract the inherent sovereignty that Indian tribes possess because it has legislative authority over federal common law." *Id.*

As a perfect capstone to these judicial tribulations, the Eighth Circuit, sitting en banc, vacated the panel decision—by an evenly divided vote, 4–4. *United States v. Weaselhead,* 165 F.3d 1209 (8th Cir.1999) (en banc).

With this array of analyses before us, we turn to the question at hand: Did Congress have the power to override *Duro* and, in effect, legislate its own version of the scope of tribal sovereignty? We conclude that it did.

## E. SEPARATION OF POWERS

It is not uncommon for Congress and the courts to disagree. And, in certain contexts, it is clear which institution holds the trump card. When the issue is a constitutional one, the courts have the last word. This principle has a long pedigree, and requires no discussion here. *See Cooper v. Aaron,* 358 U.S. 1, 18, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958) ("[T]he federal judiciary is supreme in the exposition of the law of the Constitution, and that principle has ever since [*Marbury v. Madison*] been respected by this Court and the Country as a permanent and indispensable feature of our constitutional system."); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

On the other hand, when Congress and a court duel over statutory interpretation, Congress can trump the court by amending the statute. *See* Michael E. Solimine & James L. Walker, *The Next Word: Congressional Response to Supreme Court Statutory Decisions,* 65 Temple L.Rev. 425, 454–58 (1992) (listing examples); Abner J. Mikva & Jeff Bleich, *When Congress Overrules the Court,* 79 Cal. L.Rev. 729 (1991) (discussing historical examples).

Neither of these situations is present here. *Duro* is not a constitutional decision but rather, like *Oliphant* and *Wheeler,* a decision founded on federal common law. Although the Court speaks throughout of sovereignty—a term with constitutional implications—the decision does not rest on any constitutional provision. Nowhere does *Duro* intimate that it is announcing a constitutional precept, nor does it state that its analysis is compelled or influenced by constitutional principles. *See Weaselhead,* 156 F.3d at 825 (M.S.Arnold, J., dissenting) ("The Constitution is simply silent on the . . . question of inherent Indi-

an sovereignty."). Indeed, at one point the Court mentions that "constitutional limitations" might come into play, but deliberately avoids the constitutional issue. 495 U.S. at 693–94, 110 S.Ct. 2053.

To hold, as did the *Weaselhead* panel majority, that this is a constitutional issue, 156 F.3d at 824, ignores the glaring omission of constitutional discourse from *Duro*, *Oliphant* and *Wheeler*. It would be extraordinary indeed if those were constitutional decisions that simply neglected to mention the Constitution. *Cf. Chisom v. Roemer*, 501 U.S. 380, 396 n. 23, 111 S.Ct. 2354, 115 L.Ed.2d 348 ("[The Court's] silence in this regard can be likened to the dog that did not bark." (citing A. Doyle, *Silver Blaze, in The Complete Sherlock Homes* 335 (1927))). If there is a constitutional dimension to those decisions, we cannot divine it from the language of the opinions.[7] Academic commentators have concluded likewise. L. Scott Gould, *The Consent Paradigm: Tribal Sovereignty at the Millennium*, 96 Colum. L.Rev. 809, 853 (1996) ("*Oliphant* and *Duro* were not constitutional decisions; they were founded instead on federal common law."); Frank Pommersheim, *"Our Federalism" in the Context of Federal Courts and Tribal Courts: An Open Letter to the Federal Courts' Teaching and Scholarly Community*, 71 U. Colo. L.Rev. 123, 177 (2000) ("And although it is true that the Supreme Court held in *Duro* that tribes ... did not have inherent criminal jurisdiction over non-member Indians, it cannot be said that this rule was constitutionally required.... [*Duro*] has no constitutional referent."); Deloria & Newton, 38 Fed. B. News & J.

at 72 ("the rules of *Oliphant* and *Duro* are not rules of constitutional law").

Nor is *Duro* a statutory decision. Although the Court did discuss various statutes in the course of determining that tribes did not retain criminal jurisdiction over nonmember Indians, *see, e.g.*, 495 U.S. at 691, 110 S.Ct. 2053, the decision does not interpret any particular statute.

Thus, this case presents a somewhat different twist: Who prevails when the dispute between court and Congress is neither constitutional nor statutory, but a matter of common law based on history? After all, as discussed above, *Duro* (as well as the cases upon which *Duro* relies) rests on its interpretation of the historical attributes of tribal power.

It would be disingenuous to suggest that this question presents a simple answer. On the contrary, "history" falls outside of the usual litany of authorities controlled by designated branches of government. It is neither "constitution" nor "statute," and can only roughly be labeled "federal common law." This rough fit is, however, the best one.

The term "federal common law," although it has eluded precise definition, closely mirrors the situation that faces us here: It is court-made law that is neither constitutional nor statutory. *See* Erwin Chemerinsky, *Federal Jurisdiction* 349 (3d ed.1999) (defining federal common law as "the development of legally binding federal law by the federal courts in the absence of directly controlling constitutional or statutory provisions"); Martha Field, *Sources of Law: The Scope of Federal Common Law*, 99 Harv. L.Rev. 881, 890

---

7. We consider the Court's silence on the constitutional issue to be more significant than the oft-debated effect of legislative silence. *See Chisom*, 501 U.S. at 406–07, 111 S.Ct. 2354 (Scalia, J., dissenting) ("Statutes are the law though sleeping dogs lie."). In this case, the Court acted as an interpreter of the law, and its failure to mention a particular text-particularly one as important as the Constitution-surely says something about the Court's view of the interpretive task before it.

(1986) (defining federal common law as "any rule of federal law created by a court ... when the substance of that rule is not clearly suggested by federal enactments-constitutional or congressional"). Thus, we conclude, the determination in *Duro* that tribes did not have inherent power to prosecute non-member Indians was a matter of common law. *Weaselhead*, 156 F.3d at 818 (M.S.Arnold, J., dissenting) ("the question of what power Indian tribes inherently possess ... has always been a matter of federal common law"); *accord* Gould, 96 Colum. L.Rev. at 853; Pommersheim, 71 Colo. L.Rev. at 177–78. The import of this categorization is clear, for within the realm of federal common law-and the federal common law of tribes-Congress is supreme. *Morton v. Mancari*, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). Consequently, Congress had the power to do exactly what it intended when it enacted the 1990 amendments to the ICRA.[8]

Our holding today carries a major limitation. Were this an issue of constitutional history, the outcome would be different. It cannot be the case that Congress may override a constitutional decision by simply rewriting the history upon which it is based. For instance, Congress surely cannot negate the effect of a Fourth Amendment decision by penning its own account of the scope of lawful searches at the time of the Founding. *Cf. Florida v. White*, 526 U.S. 559, 563–64, 119 S.Ct. 1555, 143 L.Ed.2d 748 (1999) ("In deciding whether a challenged governmental action violates

the [Fourth] Amendment, we have taken care to inquire whether the action was regarded as an unlawful search and seizure when the Amendment was framed."). But for all the reasons discussed above, that is not the case before us.

## III. CONCLUSION

We conclude that Congress had the power to determine that tribal jurisdiction over nonmember Indians was inherent. Therefore, acting under the 1990 amendments to the ICRA, the White Mountain Apache Tribe prosecuted Enas pursuant to its own inherent power, and a federal prosecution would proceed pursuant to a separate source of power. Consequently, the doctrine of dual sovereignty double jeopardy applies here, and the Double Jeopardy Clause is not breached by successive tribal and federal prosecutions of Enas.

**REVERSED and REMANDED.**

PREGERSON, Circuit Judge, with whom Judges TROTT, TASHIMA, and WILLIAM A. FLETCHER, Circuit Judges, join, concurring:

As Judge McKeown's opinion states, the outcome of this case depends on whether the tribal court's criminal jurisdiction over Michael Enas, a non-member Indian, rests on inherent tribal sovereignty. If the White Mountain Apache Tribe ("the Tribe") prosecuted Enas pursuant to its inherent sovereign criminal jurisdiction, the dual sovereignty exception would permit the federal government to also prosecute Enas without offending the Double

---

8. *Means* is overruled to the extent it held that Congress did not have such power. *See, e.g.,* 154 F.3d at 946. We do not disturb, however, the holding of *Means* regarding retroactivity and the Ex Post Facto Clause. *See id.* at 947–49.

We do not address whether the exercise of tribal criminal jurisdiction over non-member Indians violates the Equal Protection Clause.

That question concerns the jurisdiction of the tribal court, but at no time in this appeal has Enas contested his tribal court convictions or otherwise challenged the jurisdiction of the tribal court. Enas challenges only the power of the federal government to prosecute him. Therefore, the Equal Protection question is not before us.

Jeopardy Clause. If, however, the Tribe exercised federal power when it prosecuted Enas, the subsequent federal prosecution is barred by the Double Jeopardy Clause because both prosecutions would stem from the same sovereign entity.

The district court held that the Tribe's power to prosecute Enas, a non-member Indian, is derived from the federal government and, therefore, that the Double Jeopardy Clause bars the second prosecution. We disagree with the district court's conclusion and would reverse. We write separately, however, because we do not think it is necessary to engage in a separation of powers analysis to reach this conclusion.

## I.

### The History of the Dual Sovereignty Exception as It Applies to Successive Tribal and Federal Prosecutions

The history of the dual sovereignty exception as it applies to successive tribal and federal prosecutions has been less than straightforward for two reasons. First, the prosecutorial power of the tribes has changed over time. Second, the extent of the tribes' prosecutorial power depends in large part on whether the individual being prosecuted is a member of the prosecuting tribe (a "member Indian"),[1] an Indian who is a member of a tribe other than the prosecuting tribe (a "non-member Indian"), or a non-Indian. A brief review of the relevant case law illustrates this point.

In *Oliphant v. The Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Supreme Court

held that Indian tribal courts do not have inherent criminal jurisdiction over non-Indians. 435 U.S. at 212, 98 S.Ct. 1011. The Court reasoned that to permit the tribes to exercise such jurisdiction in the absence of congressional authorization would be inconsistent with the dependent status of the tribes.[2] Later that Term, in *United States v. Wheeler*, the Supreme Court held that the tribes retained inherent sovereign authority to prosecute member Indians for offenses committed on the reservation. 435 U.S. at 323-24, 98 S.Ct. 1079. The *Wheeler* Court explained: "[T]he sovereign power to punish tribal offenders has never been given up … and [the] tribal exercise of that power today is therefore the continued exercise of retained tribal sovereignty." *Id.* Because the *Wheeler* Court found that the tribes have inherent criminal jurisdiction over member Indians, the Court held that successive tribal and federal prosecutions of member Indians do not offend the Double Jeopardy Clause. *See id.*

The Supreme Court did not consider the issue whether the tribes retain inherent sovereignty to prosecute non-member Indians until *Duro v. Reina*, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Albert Duro, an enrolled member of the Torres–Martinez Band of Cahuilla Mission Indian Tribe, allegedly shot and killed a member of the Gila River Indian Tribe on a Salt River Pima–Maricopa Indian Reservation. *Duro*, 495 U.S. at 679–81, 110 S.Ct. 2053. Following the shooting, Duro was placed in the custody of Pima–Maricopa officers and was charged with the illegal firing of a weapon in Pima–Maricopa

---

**1.** "[U]nless limited by treaty or statute, a tribe has the power to determine tribe membership." *United States v. Wheeler*, 435 U.S. 313, 322 n. 18, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978) (citing *Cherokee Intermarriage Cases*, 203 U.S. 76, 27 S.Ct. 29, 51 L.Ed. 96 (1906)).

**2.** Because the petitioner in *Oliphant* challenged the jurisdiction of the tribal court, the double jeopardy question at issue in the instant case was not before the Court. *Id.* at 211, 98 S.Ct. 1011.

Indian Community Court. *Id.* at 681, 110 S.Ct. 2053.

Duro filed a motion to dismiss the prosecution for lack of jurisdiction, which was denied by the tribal court. *Id.* Duro then challenged the jurisdiction of the Prima–Maricopa Community Court by filing a petition for writ of habeas corpus in United States District Court. *Id.* at 681–82, 110 S.Ct. 2053. The district court granted the writ, but a divided panel of the Ninth Circuit reversed. *Id.*

The Supreme Court granted certiorari and ultimately held that "the sovereignty retained by the tribes in their dependent status within our scheme of government [does not include] the power of criminal jurisdiction over [non-member Indians]." *Id.* at 679, 684, 110 S.Ct. 2053. In so holding, the Court noted that the Indian tribes are "limited sovereigns [that are] necessarily subject to the overriding authority of the United States." *Id.* at 685, 110 S.Ct. 2053. Although the Court recognized that the tribes never explicitly surrendered their criminal jurisdiction over non-member Indians, the Court found that the exercise of such jurisdiction, in the absence of congressional authorization, would be inconsistent with the dependent status of the tribes. *Id.* at 686–96, 110 S.Ct. 2053. Thus, the Court in *Duro* held that the Pima–Maricopa Indian Community Court lacked criminal jurisdiction over Duro, a non-member Indian. *Id.* at 698, 110 S.Ct. 2053.

## II.

### The 1990 Indian Civil Rights Act Amendments and the Impact of the Amendments in Light of *Duro*

Congress reacted to the *Duro* decision by passing the 1990 amendments to the Indian Civil Rights Act ("ICRA") (hereinafter referred to as the "1990 amendments" or the "1990 ICRA amendments"). The ICRA originally defined the Indian tribes' "powers of self-government" as "all governmental powers possessed by an Indian tribe, executive, legislative, and judicial, and all offices, bodies, and tribunals by and through which they are executed, including courts of Indian offenses." Pub.L. 90–284, tit. II, § 201, 82 Stat. 77 (Apr. 11, 1986), codified at 25 U.S.C. § 1301(2) (1982). In the wake of *Duro*, Congress expanded the definition to state clearly that the tribes' "powers of self government" also include "the inherent power of Indian tribes, hereby recognized and affirmed, to exercise criminal jurisdiction over *all Indians*." 25 U.S.C. § 1301(2) (emphasis added). What is more, the legislative record unmistakably characterizes the amendments as a recognition and affirmance of the tribes' historical and inherent sovereign authority over non-member Indians. *See United States v. Weaselhead,* 36 F.Supp.2d 908, 914–15 (D.Neb.1997), *aff'd by an equally divided court,* 165 F.3d 1209 (8th Cir.1999) (en banc); *see also Means v. N. Cheyenne Tribal Court,* 154 F.3d 941, 943–44, 946–47 (9th Cir.1998).[3]

---

**3.** JUDGE REINHARDT'S CONCURRING OPINION IN *Means* PROVIDES AN EXTENSIVE DISCUSSION OF THE LEGISLATIVE HISTORY OF THE 1990 AMENDMENTS AND THE CLEAR CONGRESSIONAL INTENT "THAT § 1301 SERVE AS A CONFIRMATION OF THE TRIBES' PRE–EXISTING JURISDICTION, AND NOT AS A DELEGATION OF SUCH JURISDICTION." *Means,* 154 F.3d at 951. JUDGE REINHARDT

CITES THE FOLLOWING STATEMENTS, AMONG OTHERS, AS REPRESENTATIVE EXCERPTS FROM THE LEGISLATIVE RECORD: "[THE] LEGISLATION CLARIFIES AND REAFFIRMS THE INHERENT AUTHORITY OF TRIBAL GOVERNMENTS TO EXERCISE CRIMINAL JURISDICTION OVER ALL INDIANS ON THEIR RESERVATIONS," H.R. CONF. REP. NO. 261, 102D CONG., 2D SESS. 3 (1991) *reprinted* IN 1991

We first addressed the impact of these amendments in *Means.* 154 F.3d 941 (9th Cir.1998). An enrolled member of one tribe, Means was criminally prosecuted by another tribe for conduct he allegedly engaged in between 1978 and 1988, before the passage of the 1990 amendments to the ICRA. *Id.* at 942. Prior to trial, Means challenged the jurisdiction of the prosecuting tribe by filing a petition for a writ of habeas corpus in federal court. *Id.*

In response to the habeas petition, the prosecuting tribe argued that it properly asserted criminal jurisdiction over Means pursuant to the 1990 amendments to the ICRA. *See id.* at 943. Thus, the central issue before us in *Means* was whether the 1990 amendments to the ICRA applied retroactively. *Id.* If the amendments applied retroactively, then they would provide a basis for the tribal court to exercise jurisdiction over Means. *Id.* But if the amendments only applied prospectively, then under *Duro,* the tribal court lacked jurisdiction. *Id.*

We held in *Means* that although Congress may have intended the 1990 amendments to overrule legislatively the Supreme Court's decision in *Duro* and apply retroactively, to apply the amendments retroactively would violate the Ex Post Facto Clause by subjecting Means to tribal punishment as well as federal punishment, when at the time of his alleged crime, he was only subject to federal punishment. *Id.* at 946–48. Therefore, *Means* held that the 1990 ICRA amendments do not apply retroactively and that, under *Duro,* Means was not subject to the criminal jurisdiction of another tribe. *See id.* at 948–49.

Although the double jeopardy question at issue in the instant case was not before us in *Means,* the retroactivity issue presented in *Means* also "demanded an examination of the nature of retained tribal power." *Duro,* 495 U.S. at 685, 110 S.Ct. 2053. Specifically, *Means* required us to consider: (1) whether the 1990 amendments announced a change in the common law regarding the inherent jurisdiction of the tribes; and (2) whether Congress can enact legislation to effectively undo a prior decision of the Supreme Court. In *Means* we stated that:

> While the legislative history of [the 1990 amendments] suggests that Congress did not intend to delegate such authority to the tribes [i.e. the authority to prosecute non-member Indians], that is essentially the amendment's effect. While Congress is always free to amend laws it believes the Supreme Court has misinterpreted, it cannot somehow erase the fact that the Court did interpret the prior law. In other words, once the Supreme Court has ruled that the law is "X," Congress can come back and say, "no, the law is 'Y,'" but it cannot say that the law was *never* "X" or *always* "Y." ... Thus, regardless of the Congress' intent to declare that the tribes *always* had the inherent authority to try non-member Indians, that simply cannot be what the amendments accomplished.... Congress does not have the power to negate a Supreme Court decision. No matter how strongly Congress intended for us to "view the amendments as nullifying *Duro* and re-

U.S.C.C.A.N. 379, AND "[THE AMENDMENTS SEEK] TO ASSURE INDIAN TRIBES OF THEIR JURISDICTION OVER MISDEMEANOR CRIMES COMMITTED ON THEIR LANDS BY INDIANS WHO ARE NOT MEMBERS OF THEIR TRIBE. THE COMMITTEE IS CLARIFYING AN INHER-

ENT RIGHT WHICH TRIBAL GOVERNMENTS HAVE ALWAYS HELD AND WAS NEVER QUESTIONED," SEE 137 CONG. REC. H2988–02 (1991) (report on H.R. 972). *See Means,* 154 F.3d at 950–51 (Reinhardt, J., concurring).

instating the criminal jurisdiction of Indian tribes over non-member Indians so that it forms an unbroken line, extending back in history," we cannot do so. *Means*, 154 F.3d at 946–47 (quoting *Mousseaux v. United States Comm'r of Indian Affairs*, 806 F.Supp. 1433, 1443 (D.S.D. 1992)). On the basis of this reasoning, *Means* was constrained to hold that "[t]he only way to treat the 1990 ICRA amendments is as an affirmative delegation of jurisdiction ... which did not exist prior to 1990." *Id.* at 946.

*Means*, however, misinterpreted the effect of the 1990 ICRA amendments on the sovereign power of the tribes. In *Means* we held, on the basis of *Duro*, that Congress did not have the power to decide whether "the tribes *always* had the inherent authority to try non-member Indians." *Means*, 154 F.3d at 946. But *Duro* did not hold that the tribes never had, and may never have, the inherent authority to prosecute non-member Indians. Rather, *Duro* simply held that, at the time of the *Duro* decision and absent an act of Congress, the tribes lacked the inherent sovereign authority to prosecute non-member Indians because such authority would be inconsistent with the dependent status of the tribes. *See Duro*, 495 U.S. at 686, 110 S.Ct. 2053. The rule in *Duro*—that the tribes lacked inherent authority to exercise criminal jurisdiction over non-member Indians—continued to be the law until Congress enacted the 1990 amendments. 25 U.S.C. § 1301; *see also Strate v. A–1 Contractors*, 520 U.S. 438, 446 n. 5, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997) ("In *Duro v. Reina*, we held that Indian tribes also lack criminal jurisdiction over nonmember Indians. Shortly after our decision in *Duro*, Congress provided for tribal criminal jurisdiction over nonmember Indians."). With the 1990 amendments, Congress exercised its plenary power under the Indian Commerce Clause to restore prospectively the inherent authority of Indian tribes "over all Indians," including non-members. 25 U.S.C. § 1301(2); *see also Strate*, 520 U.S. at 446 n. 5, 117 S.Ct. 1404; *Duro*, 495 U.S. at 698, 110 S.Ct. 2053 (noting that Congress has "ultimate authority over Indian affairs").

But the fact that Congress enabled the tribes to exercise inherent sovereign power "does not mean that Congress is the source of that power." *Wheeler*, 435 U.S. at 328, 98 S.Ct. 1079. On the contrary, the historical relationship between the tribes and the federal government demonstrates that although Congress may authorize the tribes to act, the tribes nonetheless act in their own sovereign capacity.[4] As Richard

---

4. The tribes exercise "inherent" power when they act in their own sovereign capacity. By contrast, an entity acts pursuant to "delegated" power when it acts as an agent or arm of the federal government. A tribe's inherent powers include those powers historically recognized as inherent, plus those powers that Congress, in the exercise of its plenary power under the Indian Commerce Clause, recognizes as inherent in the tribe's sovereignty.

Judge McKeown's opinion suggests that although Congress has plenary power over Indian affairs pursuant to the Indian Commerce Clause, Congress lacks the authority to authorize a new power that is "inherent" in the tribes. Under this view, a tribal power must have historical roots to be "inherent." But there is nothing new about the idea that the federal government may authorize a new power that is "inherent" in another sovereign. A territory of the United States has no inherent power—when a territory prosecutes, it exercises delegated federal power, and double jeopardy prevents successive prosecutions by both the territory and the federal government based on the same underlying conduct. *Puerto Rico v. Shell Co.*, 302 U.S. 253, 264–65, 58 S.Ct. 167, 82 L.Ed. 235 (1937). When Congress passes an enabling act admitting that territory to statehood, however, the new State is "enabled" to exercise its new and inherent authority. *See generally Bartkus v. Illinois*, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d

A. Friedman, counsel for the government, explained at oral argument: "[Tribal] sovereignty is a vessel that Congress may fill or drain at its pleasure, subject to certain constitutional limitations."[5]

Using this metaphor, the Supreme Court's decision in *Duro* may be viewed as a snapshot of the tribal sovereignty vessel as it existed at the time *Duro* was decided. Through the passage of the 1990 amendments, Congress added to the vessel of tribal sovereignty by recognizing the tribes' inherent power to prosecute members of other tribes who commit crimes on the reservation.[6] The 1990 amendments are therefore appropriately characterized as a recognition and confirmation of the tribes' inherent sovereign criminal jurisdiction over all Indians.[7]

This result is consistent with the primary holding in *Means*, namely, that retroactive application of the 1990 amendments would violate the Ex Post Facto Clause. As we explained in *Means*:

> Here, [allowing the Tribal Court to exercise jurisdiction does not prevent the federal courts from exercising jurisdiction as well. There is no question that the federal courts could prosecute Means for what he is alleged to have done. Since each court could impose its own punishment, granting jurisdiction to the Tribal Court would effectively operate to increase the punishment for acts committed prior to the statute.... If the 1990 amendments are applied retroactively [ ] Means would be subject to the maximum federal penalties for his acts *plus* the maximum penalties the Tribal Court could impose for those same acts.... Thus, regardless of the fact that Means' acts would have been unlawful under federal law when he allegedly committed them, the increased punishment he would face under [ ] Tribal Court jurisdiction would seem to present an ex post facto problem.

*Means*, 154 F.3d at 947–48 (footnote omitted). Implicit in this statement is the understanding that tribal and federal sovereignty do not emanate from the same source because if Congress were the

684 (1959). In other words, the new State may now act in its own sovereign capacity, rather than as an arm of the federal government. Consequently, the dual sovereignty exception permits successive prosecutions by both the State and the federal government based on the same underlying conduct. *Abbate v. United States*, 359 U.S. 187, 193–94, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959).

**5.** As counsel for the government further noted, states are dependent sovereigns, which, in some instances, similarly lack the power to act in the absence of Congressional authorization. For example, the Supreme Court has held that the Commerce Clause of the United States Constitution prohibits the states from enacting legislation that unduly burdens interstate commerce in the absence of Congressional authorization. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 572–83, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997). But Congress has the authority to permit the states to enact legislation that would otherwise be unconstitutional under the Commerce Clause. *See Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 437–38, 66 S.Ct. 1142, 90 L.Ed. 1342 (1946). When Congress authorizes a state to act, the state nonetheless acts in its own sovereign capacity. The fact that Congress authorized the state legislation does not mean that when the state legislates, it acts as an arm of the federal government.

**6.** We have not considered and express no opinion on the question whether the phrase "all Indians" in the 1990 amendments also permits the tribes to exercise criminal jurisdiction over Indians who are not members of any federally recognized tribe.

**7.** As Judge McKeown notes, to the extent that *Means* suggests that Congress was delegating a federal authority rather than recognizing and confirming an inherent tribal authority when it passed the 1990 amendments, it is no longer the law of this circuit.

source of the tribes' power to prosecute, the Double Jeopardy Clause would bar successive prosecutions and the Ex Post Facto problem would be averted. In other words, the Ex Post Facto holding in *Means* assumes that both a tribe and the federal government may prosecute a defendant for the same underlying conduct.

This result is also consistent with Congressional intent in enacting the 1990 amendments. As discussed in footnote 3, *supra*, Judge Reinhardt's concurring opinion in *Means* provides an extensive discussion of the legislative history of the 1990 amendments and notes the clear congressional intent "that § 1301 serve as a confirmation of the tribes' pre-existing jurisdiction, and not as a delegation of such jurisdiction." *Means*, 154 F.3d at 951 (Reinhardt, J., concurring). Recognizing the inherent sovereignty of the tribes gives full effect to this Congressional intent.

This reading of the 1990 amendments is also consistent with other portions of the ICRA. For example, the ICRA limits the criminal jurisdiction of tribal courts to sentences not exceeding one year's imprisonment, a $5,000 fine, or both. *See* 25 U.S.C. § 1302(7). If the 1990 amendments were an affirmative delegation of power such that the tribal courts were effectively agents of the federal government, then the Double Jeopardy Clause would permit only one prosecution of a criminal defendant. In such a case, if a tribe prosecuted first, regardless of the severity of the defendant's conduct, the maximum punishment that the defendant could face would be limited as set forth above. *Cf. Wheeler*, 435 U.S. at 330–31, 98 S.Ct. 1079 (applying same reasoning and holding that tribes retain inherent sovereign authority to prosecute member Indians for offenses committed on reservation). It is questionable whether Congress intended such a result. *See id.* at 331, 98 S.Ct. 1079 (stating that "[w]ere the tribal prosecution held to bar the federal one, important federal interest in the prosecution of major offenses on Indian reservations would be frustrated").

Finally, this result is consistent with the general structure of federal criminal law as it relates to Indians. The federal government has historically recognized the authority of Indian tribes to exercise jurisdiction over *all Indians*. *See* WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW 124–27 (3d ed.1998). Tribal courts, such as the one that asserted jurisdiction over Enas, are independent tribal successors to the Courts of Indian Offenses, which were established by the Secretary of the Interior in the late Nineteenth Century. *See Wheeler*, 435 U.S. at 327, 98 S.Ct. 1079. The criminal code applied by the Courts of Indian Offenses in the past prescribed each offense with the opening words "[a]ny Indian who ...," without reference to the distinction between member and non-member Indians. 25 C.F.R. §§ 11.38–11.74 (1975). A few Courts of Indian Offenses remain in existence and continue to assert jurisdiction over all Indians who commit crimes in Indian country. 25 C.F.R. § 11.102(a) (2000); *see also Wheeler*, 435 U.S. at 327, 98 S.Ct. 1079. Virtually all of the tribal courts, which succeeded the Courts of Indian Offenses after the Indian Reorganization Act of 1934, initially adopted the "[a]ny Indian who ..." preamble. *See, e.g.,* Law and Order Code of the Fort McDowell Mohave–Apache Indian Community, Ch. 8 (1967); Law and Order Code of the Confederated Salish and Kootenai Tribes of the Flathead Reservation, Ch. 5, §§ 1–13, 15–20, 22–46 (1962)-both reprinted in *Indian Tribal Codes: A Microfiche Collection* (Gallagher Law Library, Univ. of Wash. 1981).

The Federal Enclaves Act, now codified at 18 U.S.C. § 1152, similarly assumes tribal power to punish any Indian, member or nonmember; it excludes from its reach "*any Indian* committing any offense in Indian country who has been punished by the local law of the tribe." 18 U.S.C. § 1152 (emphasis added). Likewise, the Major Crimes Act, 18 U.S.C. § 1153, makes no distinction between member and non-member Indians. The Major Crimes Act creates federal jurisdiction over certain crimes committed by "[a]ny Indian" in Indian country. 18 U.S.C. § 1153. Consistent with this language, the Act has regularly been applied to all Indians, regardless of their tribal membership status. *See* Canby, *supra*, at 125–27. Our reading of the 1990 ICRA amendments as recognizing and confirming the inherent sovereign authority of the tribes to exercise criminal jurisdiction over non-member as well as member Indians is consistent with this tradition.

8. We are not convinced that for congress to recognize and confirm inherent tribal criminal jurisdiction over non–member indians, congress must rely on any particular view of history, other than the historical tradition of treating tribes as sovereign bodies. The concept of "inherent" power need not be so limited. Congress could recognize and confirm inherent tribal power for the first time in the 1990 amendments, and the tribes would still be exercising their own "inherent" sovereign power, rather than "delegated" federal power. *See supra* note 4.

Indeed, the idea that congress could recognize and confirm inherent tribal power for the first time in 1990 is consistent with the process by which congress recognizes new tribes. "recognition" of a new tribe by the federal government "signifies the existence of a special relationship between the federal government and the concerned tribe that may confer such important benefits as immunity of the indians' lands from state taxation" and "entitlement to many of the federal indian services administered by the department [of interior]." Canby, *supra*, at 6. For example, between December 30, 1998 and March 13, 2000, Congress recognized two new tribes. *See* Indian

In sum, after *Duro*, Congress exercised its plenary power under the Indian Commerce Clause, through the 1990 amendments, to restore prospectively the inherent jurisdiction of Indian tribes over all Indians. The 1990 ICRA amendments are therefore appropriately characterized as a recognition and confirmation of the tribes' inherent sovereign criminal jurisdiction over non-member Indians.[8]

## III.

### The Federal Government's Prosecution of Enas Does Not Violate the Double Jeopardy Clause

We therefore conclude that the Tribe proceeded under its inherent authority when it prosecuted Enas. Although *Duro* temporarily restricted the reach of tribal power, the inherent sovereignty of tribes is a question of federal common law which Congress has the authority to alter under the Indian Commerce Clause.[9] *See Mor-*

Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 65 Fed.Reg. 13,298 (Mar. 13, 2000). These newly recognized tribes may not historically have exercised any independent sovereign powers whatsoever. Nonetheless, by recognizing the tribes, Congress has enabled them prospectively to exercise inherent sovereign authority. The authority these two tribes now exercise is termed "inherent" despite the fact that the authority did not exist in the past, because the tribes, newly recognized by Congress, are now able to act in their own sovereign capacity.

The same concept of inherent authority applies in the present action. Here, the Tribe's authority to exercise criminal jurisdiction over Enas, a non-member Indian, may be termed "inherent" not simply because the Tribe historically exercised this authority, but because the Tribe now exercises this authority in its own sovereign capacity pursuant to congressional action.

9. As one scholar explained: "[the supreme court's] holdings in *Oliphant* and *Duro* are not rules of constitutional law, but of federal common law, adopted in the absence of ex-

ton v. Mancari, 417 U.S. 535, 551–52, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974) (stating that "[t]he plenary power of Congress to deal with the special problems of Indians is drawn both explicitly and implicitly from ... Article I, § 8, cl. 3, [which] provides Congress with the power to 'regulate Commerce ... with the Indian Tribes[ ]' "); see also Arizona Pub. Serv. Co. v. Aspaas, 77 F.3d 1128, 1132 (1995) (as amended 1996). It is pursuant to the Indian Commerce Clause that Congress enacted the 1990 amendments, which recognized and confirmed the tribes' inherent power to prosecute non-member Indians.

Because the conduct for which Enas was charged allegedly took place after the passage of the 1990 amendments, the Tribe prosecuted Enas pursuant to its own inherent sovereign authority. As set forth above, the dual sovereignty exception allows two independent sovereign entities to prosecute an offender separately for the same conduct without offending the Double Jeopardy Clause. See Heath v. Alabama, 474 U.S. 82, 90, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). Because the Tribe and the federal government are properly considered separate sovereigns for double jeopardy purposes, the dual sovereignty exception permits successive tribal and federal prosecutions of Enas for the same conduct.

press congressional intent. because congress retains control of indian policy, the court must respect any 'appropriate legislation' which corrects the court's judgment, lest it exceed its article iii authority. [the 1990 ICRA amendments are] intended as just such

an expression of congressional policy." L. SCOTT GOULD, The Congressional Response to Duro v. Reina: Compromising Sovereignty and the Constitution, 28 U.C. DAVIS L. REV. 53, 79 (1994) (discussing the views of Philip S. Deloria and Nell Jessup Newton).